## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ADAM WILLIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| GARRETT STROUD, SARKIS MIKHAIL a/k/a | ) | |
| SAM MIKHAIL, and LAZARUS CAPITAL, | ) | |
| LLC | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

Plaintiff Adam Willis, by and through his undersigned counsel, alleges the following:

### NATURE OF THE ACTION

1.      This is an action for violations of the federal securities laws, breaches of fiduciary duty, fraud, and other misconduct by Garrett Stroud and Sarkis "Sam" Mikhail ("the Individual Defendants") in connection with Mr. Willis's investment of $2,096,714.48 into Defendant Lazarus Capital, LLC ("Lazarus").

2.      The Individual Defendants held themselves out as founders and managers of Lazarus, a sham company that was touted as a sophisticated cryptocurrency investment management firm but, in reality, was simply a means for the Individual Defendants to obtain money from Mr. Willis and other trusting investors.

3.      Over a three-year period, Defendants have taken millions of dollars from Mr. Willis; recklessly traded and/or misappropriated it without the slightest care or concern; violated principles of sound money management; ignored their fiduciary obligations and promises to Mr. Willis; refused to respond to valid inquiries; refused to provide financial statements and tax documents; and verbally abused Mr. Willis when he inquired about the status of his money.

4.     Defendants have lost or misappropriated virtually every dollar Mr. Willis entrusted into their care; this lawsuit seeks to hold Defendants responsible for their misconduct and recover no less than the entirety of Mr. Willis's $2,096,714.48 investment, plus interest.

## JURISDICTION AND VENUE

5.     Plaintiff Adam Willis, an individual, is a United States citizen and resident of the Netherlands.  Mr. Willis is an investor in Lazarus, a Delaware limited liability company.

6.     Defendant Lazarus Capital, LLC is a Delaware limited liability company.  Upon information and belief, the members of Lazarus Capital, LLC are defendants Garrett Stroud and Sarkis "Sam" Mikhail.

7.     On information and belief, defendant Garrett Stroud, an individual, is a citizen and resident of Missouri.  Stroud is a founder and manager of Lazarus.  Stroud was primarily responsible for overseeing the trading of funds invested in Lazarus.

8.     On information and belief, defendant Sarkis "Sam" Mikhail, an individual, is a citizen and resident of Tennessee.  Mikhail is a founder and manager of Lazarus.  Mikhail was primarily responsible for overseeing Lazarus' operations and ensuring that its capital resources were well utilized.

9.     The primary claims asserted herein arise under and pursuant to Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

10.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa).  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.     This Court has personal jurisdiction over Defendants pursuant to 10 Del. C. § 3104, 6 Del. C. § 18-105 (for Defendant Lazarus), and can you  (for Defendants Stroud and Mikhail).

2

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district, or pursuant to 28 U.S.C. § 1391(b)(3) because Defendants are subject to the Court's personal jurisdiction with respect to this action.

## FACTUAL ALLEGATIONS

*Mr. Willis Is Fraudulently Induced to Invest in Lazarus*

13.     Defendants first solicited Mr. Willis's investment in Lazarus in or around June, 2022.

14.     Prior to Mr. Willis's investments in Lazarus, the Individual Defendants each misrepresented the risk management practices that would be implemented within Lazarus.

15.     Specifically, during a video call in or around June 2022, Defendants stated that they were looking for a select few investors to participate in Lazarus, which they marketed as a "short-term trading fund" with "active risk management" and "1-2% downside per trade."

16.     Defendants further marketed Lazarus as having rigorous "capital preservation frameworks."

17.     In reality, Defendants had no intention of implementing any risk management framework designed to minimize downside risk or any capital preservation frameworks whatsoever, and never did so.  Defendants instead recklessly gambled Mr. Willis's capital on high-risk trades without implementing, for example, any hedging strategy or stop-loss protocol.

18.     Defendants also repeatedly informed Mr. Willis that Lazarus was intended to serve as a "feeder fund" to a future planned fund, "1332," in which Mr. Willis would receive an equity stake.

19.     Again, in reality, Defendants had no intention of creating the 1332 fund or of giving Mr. Willis an interest in it.

3

20.     As importantly, Defendants represented to Mr. Willis that they had expertise in cryptocurrency trading, such that Mr. Willis would be entirely dependent on their expertise and would not have control or authority over the trades being made by Stroud.

21.     Defendants thus fraudulently induced Mr. Willis into investing millions of dollars in Lazarus.

22.     On July 28, 2022, in reliance upon Defendants' misrepresentations and omissions, Mr. Willis sent approximately $200,000 to the Defendants for investment in Lazarus.

23.     On August 17, 2022, in reliance upon Defendants' misrepresentations and omissions, Mr. Willis sent an additional approximately $800,000 to the Defendants for investment in Lazarus.

24.     On August 29, 2022, Stroud solicited an additional $500,000 investment from Mr. Willis.  Willis first asked Stroud to confirm that he would retain $730,000 in "dry powder" (i.e., usable capital not at risk) and Stroud confirmed, stating, "[t]he $500K I will deploy in DeFi and the dry powder I will be[g]in deploying with 1% downside tolerance into the Top 300 market caps."  Stroud continued, "With $730k(ish) in stable[coins], our exposure is a mere $270k I've 3X'd that in about a week and I expect many more multiple of X from that minority exposure alone. My reasoning for the additional $500K is 1.) I could deploy all of that highly effectively right this minute and 2.) Having about half (of a potential $1.5M as well as moving forward regardless of our AUM) in dry powder/stables enables me to high frequency trade larger market caps for 5,7,9,11%+ gains, securely scalp those smaller rips over and over and then move all that aggregate alpha back into our stables/dry powder.  The combination of this with our minimal exposure to the very best and newest DeFi plays with the huge upside we're already experiencing the first taste of right now is a supremely effective strategy that only those with my skills or above can implement.  It's a fucking printing press, and we're already [print]ing."

4929-9872-5748, v. 1



25.    On August 30, 2022, in reliance upon Defendants' misrepresentations and omissions, which were further bolstered by Stroud's messages the day prior, Mr. Willis sent an additional approximately $500,000 to the Defendants for investment in Lazarus.

26.    Defendants traded Mr. Willis's $1,500,000 investment, increasing the value of his investments to $1,715,085.

27.    In or around September 1, 2022, Mr. Willis was sent a purported Membership Interest Purchase Agreement related to his investments in Lazarus, pursuant to which Mr. Willis believed Defendants had converted his $1,715,085 in investments into membership interests in Lazarus.

28.    The Membership Interest Purchase Agreement was sent via DocuSign, but Defendants never executed the agreement or returned a fully executed copy.

29.    In fact, the Docusign envelope containing the draft Membership Interest Purchase Agreement was voided by Defendants, thereby stopping the signing process before its completion.

30.    There is thus no valid or binding written agreement between the parties governing Mr. Willis's investments in Lazarus.

4929-9872-5748, v. 1

31.     The invalidity of the draft Membership Interest Purchase Agreement is confirmed by Defendants' failure to abide by its terms.

32.     For example, Section 1.2 of the draft Membership Interest Purchase Agreement provided that "[i]n consideration for [Mr. Willis's] purchase of the Interest, the manager of the Company agrees to name [Mr. Willis] to be a Manager of the Company as defined in Article V of the Operating Agreement."

33.     Mr. Willis was never named a Manager of Lazarus in consideration for his investments, as required by proposed Section 1.2 of the draft Membership Interest Purchase Agreement.

34.     More critically, Mr. Willis has never received an IRS form K-1 from Lazarus indicating that he held any interest in that entity for tax years 2022, 2023 or 2024.

35.     Upon information and belief, at or around the time that Mr. Willis invested in Lazarus, three other individuals were duped into making investments in Lazarus based upon the same or similar misrepresentations by Defendants.

***Defendants Fail to Implement Controls or Provide Reporting***

36.     Throughout the remainder of 2022 and through late 2023, Defendants oversaw the trading and maintenance of the capital invested in Lazarus, but failed to provide any capital reporting to investors, including Mr. Willis, who had no visibility whatsoever into the assets under management ("AUM") or net asset value ("NAV") of Lazarus throughout this time period.

37.     Defendants failed to maintain formal financial statements or audited books and records at any point during the life of Mr. Willis's investments in Lazarus, which ultimately facilitated and enabled their fraudulent conduct.

38.     Additionally, in early October 2022, Mikhail falsely assured Mr. Willis via WhatsApp that Lazarus had retained various service providers, including external legal counsel, a

third-party fund administrator, a fund custodian, and an external auditor. Mr. Willis replied, that he was "glad to see those Committed."

39.     In reality, Lazarus had absolutely no controls in place, including Defendants' failure to retain an external legal counsel, a third-party fund administrator, a fund custodian, or an external auditor. Defendants also failed to implement a hedging strategy, position-sizing limitation or stop-loss protocol of any kind—far from the "rigorous risk management" touted by the Individual Defendants.

40.     Mr. Willis repeatedly requested basic information concerning Lazarus's AUM and NAV and submitted reasonable requests for financial documentation, which Mr. Willis needed both to confirm that his funds were being invested appropriately and, importantly, for his tax filings.

41.     While Mr. Willis occasionally received informal messages from Defendants via Telegram or WhatsApp containing a snapshot of the requested information, this information was never complete or properly presented, and never in a usable format for purposes of his tax filings.

42.     More often, Defendants ignored Mr. Willis's and other investors' questions concerning Lazarus's financials entirely, or responded with total non sequiturs.

43.     For example, in October 2022, Mr. Willis asked that Stroud inform him of Lazarus's AUM, noting that Mikhail "sen[t] me the Sept[ember] performance which surprised me. I wasn't expecting a 30% decline." Stroud did not provide the AUM, instead asserting that the losses were not realized losses and were part of a broader strategy: "We haven't booked any losses so the 30% isn't a static loss[.] If you've been following the Twitter, then you obviously know the projects we have the biggest bags of are all widely viewed as the next blue chips. That is why HandsOfStone [Stroud's Twitter/X account] gets so much adulation, all of those people would kill to be positioned like us. In short, we could be positioned like we are and make millions on just

7

the slightest next rally much less the next bull run…or we could have just stayed on the sidelines, remained flat for now and then remained flat during and after the next rally or bull run.  No one alive I'm aware spends more time evaluating and making calculated risks with supreme levels of conviction than me my man."

44.　　In November 2022, Mikhail stated that Lazarus was considering providing limited partners with only "quarterly result[s] instead of a monthly NAV," evidently because monthly reporting would have revealed significant losses.  In reality, not even quarterly reporting was ever implemented at any time while Mr. Willis was invested in Lazarus.

45.　　In late September 2023, Mr. Willis asked Stroud how Lazarus had performed that month, and Stroud responded with a voice memorandum informing Mr. Willis that Lazarus had suffered large losses due to another bad trade, but still did not provide Mr. Willis with actual visibility into the true status of his investments.

46.　　Defendants remained insistent that Lazarus would prove successful and that these large losses would be recouped in full over time, with Stroud stating in a voice memorandum that he expected "a really strong run up in October" and "really nice movement up" and that "we should be looking much better than we are, like by November 1st than we are as of right now."

47.　　Mr. Willis, in an effort to avoid future losses and regain the capital lost so far, immediately proposed structured solutions and risk management frameworks that could be implemented by Defendants.  Stroud agreed, both orally and in writing, to implement these solutions and frameworks, but as Mr. Willis eventually learned to his detriment, never actually did so.

48.　　In November 2023, Mr. Willis requested an update from Stroud, asking "What is our AUM?  What is the target for [end of month?]  How much dry powder does the fund have at the moment[?]"  Stroud replied, "Yeah I can pull all this together for you today no problem, dealing

4929-9872-5748, v. 1

with realtor at the moment." Stroud did not reply further until the following day, when he wrote, "Apologies man I'll get to you soon, have one grandma dying and another that just fractured her hip, got a lot on my plate at the moment." Mr. Willis replied, "Hope everything works out, I'm sorry to hear this." Four days later, Stroud wrote, "We can chat later today or tomorrow whenever you're free[.] Fund numbers a bit above where they were last month, I see us finishing the [month] strong." Two days after that—and a week after Mr. Willis initially requested very basic information about the status of Lazarus, Stroud wrote, "Just passed $2M AUM, heading back up nicely." Another two days later, Stroud wrote, "$2.25M AUM." Mr. Willis was not provided with any documentary evidence supporting these approximate figures.

49.     Defendants' consistent refusal to provide detailed reporting about the status of Lazarus constituted a breach of the most elementary obligations of fiduciaries managing millions of dollars.

50.     In the ensuing months, Stroud continued to ignore Mr. Willis's multiple proposals for restructuring Lazarus so as to implement more robust risk management and capital preservation frameworks.

51.     In August 2024, Mr. Willis asked that Stroud send him information concerning Lazarus's AUM for Mr. Willis's tax filings, explaining that this documentation was "pretty important otherwise I can['t] write down the losses against the future gains. Please get this to me by the end of the month so I can submit it in time." Stroud said, "No problem," and Mr. Willis repeated that this information was "really important." Stroud responded, "Dude you have been driving me nuts repeating the same thing over and over to me, please stop. . . . You've been doing that with comment about all your time and money committed like I'm an amnesiac[.] Fuck you dude[.] Concern yourself with what you do wrong and I'll do the same, as I singularly always have[.]" Stroud did not send Mr. Willis the requested tax documentation.

4929-9872-5748, v. 1

52.     During this same time period, upon information and belief, the value of the sub-account containing Mr. Willis's additional capital contribution briefly surged above $750,000 over a two-day window, but Stroud failed to exit from existing positions so as to capitalize on these gains.  Instead, Stroud concentrated capital in low-cap, high-risk tokens, which positions drained the sub-account over time.  By September 2024, the value of the sub-account had plummeted from over $750,000 to only $70 due to Stroud's reckless trading practices.

53.     In late January 2025, Mr. Willis asked Stroud, "Now that we're coming up to months end, are you able to share our current AUM?"  Stroud did not reply.

54.     In late February 2025, Mr. Willis asked Stroud, "When you get time can you please give me my Fund amount value at the end of the year.  I need it for my taxes."  Stroud replied, "I can't figure it until the YDF comes back[.] You won't have capital gains but you can take the $3K deduction[.] I won't' be filing the taxes until after the extension again this year."  The next day, Mr. Willis asked, "Are you able to give me an estimate of what the fund value was at end of 2024 so I can submit it for my taxes[.]  I know you don't have the exact number but I need to be able to give something and then adjust it later if needed[.]  If you were able to liquidate everything right now how much money would I be able to get out [o]r at least if my 50% of the fund[.]"  Stroud only provided Mr. Willis with a link to a trading platform, but again refused to answer Mr. Willis's questions directly.

55.     Mr. Willis was thus left in the dark as to the reality of Lazarus's true financial status at all relevant times.

56.     As managers of Lazarus, Defendants each owed Mr. Willis fiduciary duties to exercise reasonable care, skill, and caution in managing and monitoring his investments in Lazarus and to provide transparent and full disclosure of facts material to his investments.

57.    As Mr. Willis ultimately would discover, Defendants breached their fiduciary duties to Mr. Willis beginning shortly after the investments were made and continuing through the present, though Mr. Willis did not and could not discover these breaches by reason of Defendants' fraudulent concealment thereof.

**Defendants' Fraud Induces Mr. Willis To Maintain His Investments**

58.    Defendants induced Mr. Willis to continue his investments with Lazarus through the present and to invest additional funds in March 2024, instead of exiting the Investments at a much earlier date, by grossly misrepresenting the status of the investments over time, misrepresenting the controls put in place within Lazarus for oversight and monitoring of the investments, and by concealing other material information Defendants had a duty to disclose.

59.    In July 2024, Stroud falsely assured Mr. Willis that their "mutually agreed upon PT strategies and treasury building/dry powder accumulation goals remain identical, as will my unwavering effort to execute and achieve each of them."  Stroud thus confirmed his preexisting agreement to establish a treasury and maintain a "dry powder" fund and falsely assured Mr. Willis of his continuing efforts to preserve capital.

60.    As recently as August 10, 2024, Stroud reassured Mr. Willis that he was "stick[ing] to the extra cautious plan we'd agreed to" in order to accumulate additional "powder" (*i.e.*, capital) in Lazarus.

61.    Nevertheless, only days later, Stroud admitted to another massive loss in Lazarus.

62.    When Mr. Willis expressed deep concern and questioned how a loss of this magnitude could have occurred, Stroud responded by blaming Mr. Willis for the losses and threatening to exit all of Lazarus's positions immediately and shut down the fund entirely unless Mr. Willis took "100% accountability" for Stroud's trading losses.

4929-9872-5748, v. 1

63.     This threat was not only improper, but nonsensical, as Mr. Willis never had any control or authority over the trades being made by Stroud and was entirely dependent on the Individual Defendants' purported expertise in cryptocurrency trading.

64.     Over the following months, Mr. Willis repeatedly requested information concerning Lazarus's AUM and NAV, all of which requests were ignored.

65.     Mr. Willis also requested documentation that could be submitted to tax authorities so that he could report his capital losses on his income tax filings, which requests were similarly ignored entirely.

66.     Notwithstanding this lack of transparency into Lazarus's actual financial status, Defendants repeatedly informed Mr. Willis and other limited partners of supposedly positive developments in the trading within Lazarus.

67.     All the while, Defendants were fraudulently concealing further massive trading losses incurred by Stroud.

68.     For example, in December 2022, Mikhail informed Mr. Willis, "Garrett put in some ungodly hours the past couple weeks. Even more than usual, he was a machine. In a horrible death spiral crypto market were billion dollar funds are imploding, Garrett was able to make a +13.96% gain on 12/1 NAV. Your balance is up over $153,300."

69.     In late January 2023, Stroud informed Mr. Willis, "Up a $Million MoM and we haven't even started cooking yet boys."

70.     In June 2023, Stroud informed Mr. Willis, "Over the same 7-day timeframe shown above, our AUM has moved back up $516K of which $421K is only since 12am on 6/1. . . . In summation, we are experiencing outlier gains in a market that has been simultaneously flat to down. That in and of itself is nothing to rave about as my job is to do that very thing in spite of market conditions, but was is worthy [sic] of being excited is the historical AUM increases (albeit

from just a 9 month sample size) we've seen during the meager total of 2-3 weeks in total over those 9 months that market conditions have been at least a modicum of 'favorable'.  As a majority of key indicators are showing the next 2-3 months will offer the most favorable conditions we've seen since we launched and with hypertrading now being a part of our arsenal, I'm feeling bullish as f*ck that our ascent will finally become imminent."

71.     In March 2024, following months of pressure from Stroud with respect to the need for new capital to be invested in Lazarus, and in reliance upon Defendants' misleading reporting of positive developments in the trading within Lazarus, Mr. Willis invested an additional $381,699.48 in Lazarus, which was intended to be used as discretionary trading capital subject to explicitly stated preconditions as to how the investment would be treated, bringing Mr. Willis's total investment with Defendants to $2,096,714.48, representing approximately 55% of the fund's NAV.

72.     These preconditions included Mr. Willis's clear instruction, via voice memorandum, that there would be a 10% maximum drawdown on the additional $381,699.48 investment, with the stated goal of tripling Mr. Willis's investment within 90 days to build a cash reserve or "treasury" for Lazarus.

73.     Stroud directed Mr. Willis's additional capital contribution into a "sub-account" to keep its assets and trading separate from the rest of the funds invested in Lazarus for reporting purposes.

74.     In October 2024, Stroud wrote to all Lazarus investors (including Mr. Willis) stating, "As an increasing number of indications that a bull(ish at least) market is coming, I'm confident that we will maximize the opportunities for 'wins' and excited to begin sharing those forthcoming successes in this group."

75.     As recently as January 2025, Stroud falsely assured Mr. Willis and other limited partners that Lazarus had "quite a bit of liquidity."

76.     Specifically, in January 2025, Stroud wrote to Lazarus investors in a WhatsApp chat, "Thinking the next run up is right around the corner, when ETH regains 4K we'll see selected alts and categories move quick.  Planning to take profits and store them in BTC and stablecoins.  Was tough going before November but I learned many valuable lessons and remain very confident that our future looks bright.  In the interest of delivering upon my commitment to making LAZ a success, I've also made the decision to forgo my share of the fund which is roughly 15%.  This will have each of you seeing a [return on investment] sooner and cashing out should you choose to.  That said, I have zero intention of retiring any year soon so those that want to continue riding with me are more than welcome and will share in the future profits from 1332."

77.     A Lazarus investor responded asking, "how's the fund doing overall?"  A second investor replied, "My question exactly.  Are we even?  Down 25%?  Up 100%?"  Stroud replied, "Got about 4X to break even, quite a bit of liquidity in DeFi projects which I anticipate will bring us up quickly when they move."  The first investor replied, "I'm not even sure what that means[.] the fund needs 4x to get to even?"  Stroud replied, "Yes."  The first investor replied, "Weren't we even just a month or two ago," and Stroud replied, "No, that was the year before."  The first investor asked, "How is the fund down 80% in an up market?  Should be talking about all the trades [not] just the wins if we're down that much."  Stroud replied, "We had 1 month (this past November) that the majority of the market was up since the FTX collapse, and I'm not going to make any excuses. That is what I have been doing, and will continue doing it for 0% share of the fund until each of you are in profit and satisfied with your investment."  The second investor asked Mikhail, "do you have any input for the stakeholders?"  And Mikhail replied, "I've also invested

into the fund as everyone has. Not involved with the day to day or trading but I'm grateful we [sic] still fighting, unlike some."

78.    Such assurances clearly would lead, and were intended to lead, a reasonable investor such as Mr. Willis to believe that notwithstanding some losses, Lazarus was maintaining a reserve of low-risk, highly liquid assets that could serve as a safety net if needed and that with Stroud's continued management of their capital based on the strict risk protocols he had touted, they would receive a return on their investments in the near future.

79.    Unfortunately for Mr. Willis, Defendants' assurances that they had implemented an "extra cautious plan" and were seeing positive results were false, as upon information and belief, Defendants already had depleted Lazarus at the time these assurances were made.

***Stroud's Abusive Behavior to Mr. Willis***

80.    In an effort to distract from the rampant misconduct occurring within Lazarus and dissuade Mr. Willis from seeking legal recourse, Stroud frequently ignored Mr. Willis's requests for information about the status of his investments or, worse, maliciously insulted Mr. Willis in an effort to avoid responsibility for his own misconduct.

81.    A typical response of Stroud to Mr. Willis's entirely reasonable efforts to obtain information about his own money was "stop hounding me like this."

82.    By way of example only, in August 2024, when Mr. Willis once again sought information from Stroud concerning Lazarus' trading losses so that he could use it to offset future gains in his tax filings, Stroud responded, "Dude you have [been] driving me nuts repeating the same thing over and over to me, please stop. . . . You've been doing that with comment [sic] about all your time and money committed like I'm an amnesiac. Fuck you dude."

4929-9872-5748, v. 1

83.    Stroud's berating of Mr. Willis was pervasive throughout their communications.

84.    In another August 2024 exchange, Stroud wrote to Mr. Willis, "Are you fucking retarded?"; "Punk"; "you smarmy fucker"; "You fucked up"; and "you must be feeling incredibly weak as a man right now."

85.    Notwithstanding Stroud's unprofessional and abusive conduct, Mr. Willis remained hopeful that Stroud's investment strategies would be successful and that his investment in Lazarus would receive a positive return on investment over time should he stay the course, as Stroud repeatedly urged Mr. Willis and other investors to do.

***Defendants Finally Admit that Lazarus Suffered Catastrophic Losses***

86.    On March 1, 2025, mere weeks after representing that Lazarus had sufficient liquidity and expected to obtain even more liquidity in the near term, Stroud informed Mr. Willis via voice memorandum that Lazarus, which previously had nearly $4,000,000 in capital, had lost everything and was down to only $10,000 in tradeable capital.

87.    Mr. Willis was shocked by this news, given that his conversations with Defendants and the updates received from them in the past year had been largely positive.  Mr. Willis immediately requested details about the trading that resulted in losses of this magnitude and an explanation of what had gone wrong, which Defendants again did not provide, with Stroud attempting to avoid any responsibility for his conduct by stating that he was "not going to keep engaging in negative round and round right now."

88.    Over a two-and-a-half year period, Defendants willfully misled Mr. Willis and the other investors as to Lazarus' financial performance in a protracted effort to convince them to invest in Lazarus in the first place and to maintain, and even increase, those investments over time.

89.    Additionally, throughout his participation in Lazarus, Mr. Willis was repeatedly assured that he would receive the promised equity stake in the future 1332 fund, which also induced him to maintain the Investments rather than attempting to withdraw them.

90.    Mr. Willis reasonably relied upon these misrepresentations over a multi-year period, but had he known the true status of the investments and the fact that he would never receive any equity in 1332, he would have sought to liquidate his position in Lazarus years ago, thereby salvaging at least a portion of—if not the full amount of—his investments.

91.    Upon information and belief, only approximately $10,000 remains in Lazarus.

92.    Defendants' depletion of the entirety of the capital to which they were entrusted is astounding, devastating, and wholly inexplicable absent fraudulent misconduct and a total dereliction of Defendants' fiduciary duties owed to Mr. Willis and other investors in Lazarus.

93.    Not only have Defendants lost the entirety of Mr. Willis's $2,096,714.48 investment, but they have denied him the ability to recoup any portion of this loss by declaring it on his tax filings due to their consistent refusal to provide him with the requisite information and documentation.

94.    Upon information and belief, Stroud has intentionally structured his assets to shield them from creditors by moving assets into various offshore entities and accounts, including, but not limited to, his share of Lazarus.

95.    In April 2023, Stroud sent Mr. Willis a link to a blog post on the website "Offshore Protection," available at https://www.offshore-protection.com/offshore-blog/nevis-llc-cook-islands-trust-swiss-account, and stated, "Also wanted to share with you how I'm going to be protecting my share of our LAZ/1332 redemptions long-term. . . . Those 3 combined are a fortress."

17

96.    The offshore structure described in the blog post consists of a limited liability company organized in St. Kitts and Nevis, a trust organized in the Cook Islands, and a Swiss offshore bank account.

97.    As recently as March 2024, Stroud claimed to have personal assets of over $13 million, boasting in a message to Mr. Willis that "I feel like 14 million bucks," and followed up by stating, "[t]here I go exaggerating again 🤦 I feel like $13,403,557.30 😂 And I'm by FAR most proud of that 30 cents."



98.    In stark contrast to his previous claim to have an eight-figure net worth, and ostensibly in an effort to forestall the filing of this lawsuit, Stroud recently sent Mr. Willis a WhatsApp message claiming to have no assets ("rekt personally") and to have "taken the initial steps of filing for bankruptcy."

99.    In the same message, Stroud inexplicably claimed that he had "no plans on giving up on trading or the fund. I've turned less into more before." Stroud did not explain the strategy by which he expects to turn less than $10,000 into over $4 million.

18

## CAUSES OF ACTION

### COUNT I
**Violations of Section 10(b) of the Securities Exchange Act of 1934
and Rule 10b-5 Promulgated Thereunder in Connection with Investment in Lazarus
(Against All Defendants)**

100.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

101.    Defendants carried out a plan, scheme, and course of conduct which was intended to, and did, deceive Plaintiff, as alleged herein, by causing Plaintiff to invest in Lazarus.  In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants took the actions set forth herein.

102.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiff and other investors in Lazarus.

103.    Defendants engaged in the above conduct, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails.

104.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and omission were made knowingly or recklessly and for the purpose of concealing Lazarus's risk management and capital preservation framework, the controls in place within Lazarus, and the future business prospects from investors, including Plaintiff, in order to induce investors to invest in Lazarus over a multi-year period.

19

105.     As a result of and in reliance upon Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiff was fraudulently induced to invest in Lazarus through what he understood to be a purchase of membership interests in Lazarus, which were unregistered securities.

106.     At the time of said misrepresentations and omissions, Plaintiff was ignorant of their falsity and believed them to be true.  Had Plaintiff known the truth regarding the risk management protocols, capital preservation framework and controls that were represented to exist within Lazarus, as well as the nature of Stroud's reckless trading practices, none of which were disclosed by Defendants, Plaintiff would not have invested in Lazarus.

107.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

108.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered damages in connection with his investments in Lazarus, including the loss of Mr. Willis's $2,096,714.48 investment and inability to recoup any portion of this loss by declaring it on his tax filings.

109.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff's investments in Lazarus giving rise to the cause of action.

## COUNT II
### Violations of Section 10(b) of the Securities Exchange Act of 1934
### and Rule 10b-5 Promulgated Thereunder in Connection with Cryptocurrency Investments
### (Against All Defendants)

110.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

111.     Defendants carried out a plan, scheme, and course of conduct which was intended to, and did, deceive Plaintiff, as alleged herein, by causing Plaintiff to contribute capital to enable

Stroud's trading of cryptocurrency and other digital assets through Lazarus. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants took the actions set forth herein.

112.    Various digital assets bought and sold by Stroud with Mr. Willis's money were securities, as defined by *SEC v. W.J. Howey Co.*, 328, U.S. 293 (1946) and its progeny.

113.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiff and other investors in Lazarus.

114.    Defendants engaged in the above conduct, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails.

115.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and omission were made knowingly or recklessly and for the purpose of concealing Lazarus's financial condition and future business prospects from investors, including Plaintiff, in order to induce investors to invest in Lazarus and continue and/or increase their investments over a multi-year period.

116.    As a result of and in reliance upon Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiff was fraudulently induced to contribute capital to Lazarus to facilitate Stroud's trading, in ignorance of the fact that Defendants were concealing the financial status of Lazarus.

117.    At the time of said misrepresentations and omissions, Plaintiff was ignorant of their falsity and believed them to be true. Had Plaintiff known the truth of Lazarus's financial condition,

which was not disclosed by Defendants, Plaintiff would not have invested in cryptocurrency securities through Lazarus.

118.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

119.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered damages in connection with his investments in Lazarus, including the loss of Mr. Willis's $2,096,714.48 investment and inability to recoup any portion of this loss by declaring it on his tax filings.

120.    This action was filed within two years of discovery of the fraud and within five years of Plaintiff's investments in cryptocurrency securities through Lazarus giving rise to the cause of action.

<u>**COUNT III**</u>
**Breach of Fiduciary Duty (Against the Individual Defendants)**

121.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

122.    At all relevant times, the Individual Defendants had been entrusted with Mr. Willis's capital and owed Plaintiff fiduciary duties, regardless of whether Lazarus was a real cryptocurrency trading fund or merely an instrumentality of fraud.

123.    The Individual Defendants owed Plaintiff the fiduciary duties of loyalty, care, and good faith.

124.    The Individual Defendants breached each of these duties by, among other things, failing to properly oversee Lazarus and ensure that proper risk management and capital preservation frameworks were in place; failing to implement any controls within Lazarus; failing to make complete and truthful, or at times any, disclosures with respect to Lazarus's financial

22

status; and intentionally and/or recklessly losing or misappropriating virtually all funds Plaintiff had invested.

125.     The Individual Defendants, through their misrepresentations and omissions concerning Lazarus's financial status and risk management and capital preservation frameworks, as well as their failure to maintain adequate books and records for Lazarus, intentionally and fraudulently concealed from Plaintiff the facts necessary to have put him on notice of their breaches of fiduciary duty.

126.     As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff has suffered significant injury, including the loss of Mr. Willis's $2,096,714.48 investment and inability to recoup any portion of this loss by declaring it on his tax filings, and is entitled to an award of damages in an amount to be determined at trial.

## COUNT IV
### Fraudulent Inducement (Against the Individual Defendants)

127.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

128.     The Individual Defendants each grossly misrepresented to Plaintiff the risk management practices that would be implemented within Lazarus.

129.     These misrepresentations included, but were not limited to, the Individual Defendants marketing Lazarus as a "short-term trading fund" with "active risk management" and "1-2% downside per trade," and as having rigorous "capital preservation frameworks."

130.     In reality, the Individual Defendants had no intention of implementing any risk management framework designed to minimize downside risk or any capital preservation frameworks whatsoever, and never did so.  Defendants instead recklessly gambled Mr. Willis's capital on high-risk trades without implementing, for example, any hedging strategy or stop-loss protocol.

4929-9872-5748, v. 1

131.    The Individual Defendants also repeatedly informed Plaintiff that Lazarus was intended to serve as a "feeder fund" to the future planned 1332 fund, in which Plaintiff would receive an equity stake.

132.    Again, in reality, the Individual Defendants had no intention of creating the 1332 fund or of giving Plaintiff an interest in it.

133.    The Individual Defendants thus fraudulently induced Plaintiff into investing millions of dollars in Lazarus.

134.    The Individual Defendants, through their misrepresentations and omissions concerning Lazarus's financial status and risk management and capital preservation frameworks, intentionally and fraudulently concealed from Plaintiff the facts necessary to have put him on notice of their fraudulent inducement.

135.    Plaintiff justifiably relied upon the false statements made by the Individual Defendants, as founders and managers of Lazarus, concerning Lazarus's risk management and capital preservation framework and his future equity stake in the future planned 1332 fund, when he made the decision to make a substantial investment in Lazarus.

136.    As a result of the Individual Defendants fraudulently inducing Plaintiff to invest in Lazarus, Plaintiff has suffered significant injury, including the loss of Mr. Willis's $2,096,714.48 investment and inability to recoup any portion of this loss by declaring it on his tax filings, and is entitled to an award of damages in an amount to be determined at trial.

## COUNT V
**Fraud (Against All Defendants)**

137.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

138.    Defendants made material misrepresentations concerning the risk management and capital preservation frameworks and financial status of Lazarus.

4929-9872-5748, v. 1

139.     These misrepresentations included, but were not limited to, the Individual Defendants falsely assuring Plaintiff that Defendants were implementing robust risk management and capital preservation frameworks and adequate controls within Lazarus despite the absence of any such frameworks or controls, and falsely assuring Plaintiff that Lazarus was operating successfully at a time when the fund already had suffered substantial losses.

140.     Defendants also failed to issue requisite reporting to Plaintiff concerning the AUM and NAV of Lazarus that would have revealed the substantial trading losses within Lazarus, with Defendants repeatedly informing Plaintiff and other investors of supposedly positive developments in the trading within Lazarus while concealing the much more substantial losses.

141.     Defendants' misrepresentations were intended to lead, and did lead, a reasonable investor such as Plaintiff to believe that Lazarus was maintaining low-risk, highly liquid assets that could serve as a safety net if needed.

142.     Unfortunately for Plaintiff, Defendants' assurances were false, and the Individual Defendants already had depleted Lazarus at the time these assurances were made.

143.     Defendants also repeatedly reaffirmed that Lazarus was intended to serve as a "feeder fund" to the future planned 1332 fund, in which Plaintiff would receive an equity stake.

144.     Plaintiff justifiably relied upon the false statements made by Defendants when he made the decision to continue his investment in Lazarus and to increase his investment in March 2024.

145.     As a result of Defendants' fraud, Plaintiff has suffered significant injury, including the loss of Mr. Willis's $2,096,714.48 investment and inability to recoup any portion of this loss by declaring it on his tax filings, and is entitled to an award of damages in an amount to be determined at trial.

## COUNT VI
### Breach of Contract (Against Lazarus)

146.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

147.    There is no valid agreement among the parties governing Plaintiff's investments. However, in the event that the Court determines that the draft Membership Interest Purchase Agreement as a valid and binding agreement, Lazarus has breached that agreement.

148.    The Membership Interest Purchase Agreement provided that Plaintiff would be entitled "to the rights, privileges and restrictions of a member as set forth in the Operating Agreement," which operating agreement in turn provides that Lazarus was required to "keep true and complete records and books of account, in which shall be entered fully and accurately each transaction of [Lazarus]," and to prepare and distribute annual financial statements "prepared in accordance with U.S. GAAP" for each fiscal year and quarterly account statements "reflecting the results of [Lazarus] for the previous reporting period."  Lazarus failed to comply with any of these recordkeeping or reporting requirements by failing to make any disclosures to Plaintiff with respect to Lazarus's financial status and, instead, affirmatively misrepresenting Lazarus's financial status while concealing trading losses.

149.    Defendants also failed to name Plaintiff a manager of Lazarus in consideration for his investments in Lazarus, as required.

150.    Lazarus's breaches of the Membership Interest Purchase Agreement caused Plaintiff damages, including the loss of Mr. Willis's $2,096,714.48 investment and inability to recoup any portion of this loss by declaring it on his tax filings, such that Plaintiff is entitled to an award of damages in an amount to be determined at trial.

4929-9872-5748, v. 1

## COUNT VII
### Rescission (Against Lazarus)

151.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

152.    There is no valid agreement among the parties governing Plaintiff's investments. However, in the event that the Court determines that the draft Membership Interest Purchase Agreement was a valid and binding agreement, Plaintiff is entitled to rescission.

153.    The Membership Interest Purchase Agreement provided that Plaintiff would be entitled "to the rights, privileges and restrictions of a member as set forth in the Operating Agreement," which operating agreement in turn provides that Lazarus was required to "keep true and complete records and books of account, in which shall be entered fully and accurately each transaction of [Lazarus]," and to prepare and distribute annual financial statements "prepared in accordance with U.S. GAAP" for each fiscal year and quarterly account statements "reflecting the results of [Lazarus] for the previous reporting period."  Lazarus failed to comply with any of these recordkeeping or reporting requirements by failing to make any disclosures to Plaintiff with respect to Lazarus's financial status and, instead, affirmatively misrepresenting Lazarus's financial status while concealing trading losses.

154.    Defendants also failed to name Plaintiff a manager of Lazarus in consideration for his investments in Lazarus, as required.

155.    Plaintiff was fraudulently induced to enter into the Membership Interest Purchase Agreement by the Individual Defendants, the founders and managers of Lazarus, who each grossly misrepresented to Plaintiff the risk management practices that would be implemented within Lazarus and falsely informing Plaintiff that Lazarus was intended to serve as a "feeder fund" to the future planned 1332 fund, in which Plaintiff would receive an equity stake.

156.    The Individual Defendants, as managers of Lazarus, repeatedly breached their fiduciary duties owed to Plaintiff, including by failing to properly oversee Lazarus and ensure that proper risk management and capital preservation frameworks were in place; failing to implement any controls within Lazarus; failing to make appropriate, or any, disclosures with respect to Lazarus's financial status; and intentionally and/or recklessly losing or misappropriating virtually all funds Plaintiff invested in Lazarus.

157.    Plaintiff's fraudulent inducement to enter into the Membership Interest Purchase Agreement, together with Lazarus's breaches of the Membership Interest Purchase Agreement and fraudulent misconduct, and the Individual Defendants' repeated breaches of their fiduciary duties, warrant legal and/or equitable rescission of the Membership Interest Purchase Agreement.

## COUNT VIII
### Unjust Enrichment (Against All Defendants)

158.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

159.    Defendants were enriched by reason of Plaintiff's investments in Lazarus.

160.    By reason of Defendants' fraudulent misconduct, Plaintiff has lost the entirety of his investments in Lazarus.

161.    There is no justification for Defendants' enrichment at Plaintiff's expense.

162.    There is no adequate remedy provided by law.

163.    As a result of Defendants' unjust enrichment, Plaintiff has suffered significant injury, including the loss of Mr. Willis's $2,096,714.48 investment and inability to recoup any portion of this loss by declaring it on his tax filings, and is entitled to an award of damages in an amount to be determined at trial.

4929-9872-5748, v. 1

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendants as follows:

(a)     Awarding Plaintiff compensatory damages in an amount to be proven at trial for all injuries sustained as a result of Defendants' misconduct as set forth herein, including the loss of Mr. Willis's $2,096,714.48 investment and inability to recoup any portion of this loss by declaring it on his tax filings, as well as pre-judgment and post-judgment interest;

(b)     Awarding Plaintiff punitive damages due to the gross, oppressive, and aggravated nature of the Defendants' misconduct;

(c)     Awarding Plaintiff his reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Awarding such other relief as this Court may deem just and proper.

PRICKETT, JONES & ELLIOTT, P.A.

OF COUNSEL:

Steven R. Popofsky
Joshua K. Bromberg
Alisa Benintendi
KLEINBERG, KAPLAN, WOLFF &
COHEN, P.C.
500 Fifth Avenue
New York, New York 10110
(212) 986-6000
SPopofsky@kkwc.com
JBromberg@kkwc.com
Abenintendi@kkwc.com

Dated: October 22, 2025

*/s/ John G. Day*
John G. Day (#6023)
Brianna V. Manobianco (#7425)
1310 N. King Street
Wilmington, DE 19801
(302) 888-6500
jgday@prickett.com
bvmanobianco@prickett.com

*Counsel for Plaintiff Adam Willis*

29